## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:

BEAU DIAMOND.                          Case No.:  8:09-bk-6199-KRM

      Debtor.                          Chapter 7

_____/


SHARI STREIT JANSEN, as Chapter
7 Trustee,

      Plaintiff,

v.                                     Adv. Proc. No.: _____

DANIEL KELLUM, an individual,

      Defendant.

_____/


### COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS

Plaintiff, Shari Streit Jansen, as the Chapter 7 Trustee ("**Trustee**" and/or "**Plaintiff**") for the bankruptcy estate of Beau Diamond in Case No. 8:09-bk-06199-KRM, by and through her undersigned counsel, files her Complaint to Avoid and Recover Fraudulent Transfers against Daniel Kellum, and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure seeking to avoid and recover fraudulent transfers made to Defendant pursuant to Sections 544, 548, and 550 of the Bankruptcy Code and Chapter 726 of the Florida Statutes.

2.      This court has jurisdiction over this cause pursuant to 28 U.S.C. §§ 157(b)(2)(A)(B)(H) and (O) and 1334.

3.      This matter is a core proceeding pursuant to 28 U.S.C. § 157.

4.      On March 31, 2009 ("**Petition Date**"), Beau Diamond (the "**Debtor**") filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code.

5.      Plaintiff, Shari Streit Jansen is the appointed Chapter 7 trustee for the Debtor's bankruptcy estate.

6.      Daniel Kellum ("**Kellum**") is an individual residing in Tipton, Michigan.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

**A.      The Debtor Engaged in a Ponzi Scheme**

8.      On or about March 30, 2006, the Debtor formed Diamond Ventures, LLC ("**Diamond Ventures**").

9.      The Trustee realleges and incorporates paragraphs 1 through 7 as if fully set forth herein.

10.     On or about March 30, 2006, the Debtor formed Diamond Ventures with its principle place of business in Sarasota, Florida.

11.     Prior to his incarceration, the Debtor resided in Sarasota, Florida.

12.     At all material times, the Debtor was the managing member of Diamond Ventures, LLC.

13.     The only other person listed as a member of Diamond Ventures by the Secretary of State, Harvey Diamond, denies any involvement in the formation and business operations and

activities of Diamond Ventures.

14.     From April 2006 to the present, the Debtor through Diamond Ventures, LLC solicited approximately $37 million from at least 200 members of the general public, for the purported purpose of trading off-exchange foreign currency ("**forex**") contracts.

15.     As the managing member of Diamond Ventures, the Debtor opened and managed Diamond Ventures' forex trading accounts.

16.     The Debtor deposited the funds received from investors into accounts in the name of Diamond Ventures which were controlled by the Debtor.

17.     As the managing member of Diamond Ventures, the Debtor controlled Diamond Ventures' bank accounts.

18.     As the managing member of Diamond Ventures, the Debtor controlled all aspects of Diamond Ventures' solicitations.

19.     As managing member of Diamond Ventures, the Debtor made or controlled all decisions concerning Diamond Ventures' business operations.

20.     To induce members of the public to invest with Diamond Ventures, the Debtor falsely represented to investors that Diamond Ventures could guarantee the return of the investor's original investment and also receive monthly returns of between 2.75% and 5% because Diamond Venture's forex trading generated monthly profits of up to 30%.

21.     The Debtor executed the Participation Agreements on behalf of Diamond Ventures that were entered into with the investors whereby Diamond Ventures contractually guaranteed investors the return of their original investment and monthly returns between 2.75% and 5% on their investment, depending upon the date of the investment.

22.     The Debtor also represented to investors that nothing in the contract (the Participation Agreement) "…releases me from liability or that does anything but promises the security of your funds and the guaranteed 5% return.  My lawyer actually put in a paragraph basically releasing me of liability and I told him to remove this."

23.     The Debtor also caused Diamond Ventures to provide false promotional materials to investors falsely representing to investors that the investor assumed no risk by investing in Diamond Ventures, that Diamond Ventures was safe and secure, that trading in forex is recession proof, that the maximum trading loss was 15%, and that Diamond Ventures maintained a reserve account to cover any losses.

24.     The Debtor made the representations with the intent that investors rely on the representations so as to invest with Diamond Ventures, a company that he owned and controlled.

25.     At all times relevant hereto, the Debtor knew that these representations were false and misleading and were intended to induce such investors into transferring their money to Diamond Ventures.

26.     The Debtor knew that Diamond Ventures trading was unprofitable and sustaining losses far in excess of the alleged 15% maximum loss and that Diamond Ventures was not making a profit or other income and that it could never meet the "guaranteed" rate of return.

27.     The Debtor knew that Diamond Ventures did not have a reserve account that could cover the losses.

28.     The Debtor knew that investing with Diamond Ventures was not safe.

29.     From September 2006 through February 2009, the Debtor and Diamond Ventures lost approximately $13.2 million.

-4-

30.    The Debtor and Diamond Ventures did not engage in any income producing activity other than soliciting and obtaining funds from investors and trading forex contracts in which it lost money.

31.    The Debtor's sole source of income was from funds received from Diamond Ventures.

32.    The source of monthly return payments or repayment to investors was not from bona fide investments, but from investment funds received from other investors.

33.    The trading conducted by the Debtor through Diamond Ventures resulted in substantial losses and the Debtor did not make a profit.

34.    Instead of investing all of the funds, the Debtor through Diamond Ventures would use a large portion of the existing funds of investors to make the promised monthly returns to customers or to repay customers.

35.    The Debtor through Diamond Ventures also used funds invested by subsequent customers to make the monthly returns for existing customers or to repay customers.

36.    The monthly returns made to investors came either from fictitious profits, existing investors' original principal and/or from money invested by subsequent investors.

37.    The Debtor's operation of Diamond Ventures constituted a Ponzi Scheme.

38.    To assure a continual source of funds in order to perpetuate the fraud and Ponzi Scheme, the Debtor offered commissions to investors for referral of new investors, an indicia of a fraudulent Ponzi Scheme.

39.    The Debtor also caused Diamond Ventures to issue monthly account statement which reported profits that were consistent with the promised guaranteed monthly returns.  These monthly

reports were false and failed to disclose that Diamond Ventures incurred substantial losses, that the Debtor had misappropriated funds, and that any returns on investment provided to investors came from either prior investor investments or money subsequently invested by subsequent investors.

40.    To further perpetuate the fraud and Ponzi Scheme, the Debtor lulled investors into not withdrawing their purported monthly earnings by offering a larger monthly return to investors who opted to compound their false earnings.

41.    The Debtor and Diamond Ventures did not invest all of the funds received from the investors into forex contracts.  Rather, the Debtor through Diamond Ventures used a substantial portion of the funds received for his own personal uses and lived a lavish lifestyle using the funds received from customers.

42.    In running the Ponzi Scheme, the Debtor and Diamond Ventures made transfers to the various investors totaling approximately $15.6 million, which derived either from fictitious profits, from existing customers' original investment and/or from money invested by subsequent customers.

43.    Payments to investors began in or about May 2006 and ended in or about December 2008.

44.    All known payments were made by check or wire transfer from accounts at two financial institutions and each check was made payable to the investor by name.

45.    Payments to investors were primarily made by check or wire transfer from the Bank of America account maintained by the Debtor and Diamond Ventures, account no. ending in 7477.

46.    Investors received from the Debtor on Diamond Ventures monthly statements which detailed the status of their investments for the previous period, including the amount earned.

-6-

**B.    The Indices of a Ponzi Scheme were Obvious from the Start**

47.    In order to participate in the Debtor's investment program, which the Debtor referred to as the "club", investors were required to sign a participation agreement.  A copy of a participation agreement signed by an investor is attached hereto as Exhibit "A".  It is believed that the participation agreement is substantially identical to those signed by other investors.

48.    The participation agreement required the investors to maintain secrecy regarding their participation in the investment program, a common indicia of the operation of a Ponzi scheme.

49.    The Debtor guaranteed initial investors the return of invested funds as well as the 5% monthly returns.  A 5% monthly return is a 60% return annually. No reasonable investor would believe that 60% annual return was possible.

50.    The 5% monthly rate of return promised by the Debtor greatly exceeded the prevailing market rates at the time it was offered, suggesting that the promised monthly returns would not be achieved through actual market trading.

51.    Despite the implausible rate of return promised by the Debtor, the Debtor failed to offer any explanation for why the promised rate greatly exceeded prevailing market rates or any justification for such a high rate of return.

**C.    The State Court Action by Investors**

52.    The Debtor is the subject of a pending civil action filed by investors in *DeLoach v. Diamond Ventures, LLC*, Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Case No. 2009-CA-000548NC (the "**State Court Action**").

53.    Consistent with the allegations herein, the civil complaint filed by investors against Debtor in the State Court Action alleges the following:

a.      Since the formation of Diamond Ventures, Diamond Ventures and Beau Diamond engaged in a Ponzi scheme in which they raised $35 million in capital from at least 100 investors by offering contracts to participate in an investment program that purported to generate returns through sophisticated trading in foreign exchanges. (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 22).

b.      "By targeting their close friends and associates, Defendants pursued an 'affinity fraud' wherein Defendants used payouts to initial investors to lure in said investor's friends and associates to expand the pool of investors." (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 24).

c.      The participation agreement specified that the participants would receive a Form 1099, however, the investors did not receive a Form 1099. (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 25).

d.      The participation agreement required strict confidentiality in "an effort to restrict the disclosure of the program and to control the investors." (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 26).

e.      The participation agreement provided that Diamond Ventures and/or the Debtor guaranteed the investor the return of their deposit and their earnings. (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 27).

f.      Diamond Ventures was legal in form, but in fact was a sham created by or on behalf of Beau Diamond and his father, Harvey Diamond to further their Ponzi scheme. (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 43).

g.      The legitimate business activities of Diamond Ventures were very minor in comparison to the scheme of fraud perpetrated by the Defendants.  Diamond Ventures was, in fact, a "shell" created by or on behalf of Beau Diamond and Harvey Diamond for the purpose of conducting an improper fraudulent enterprise, the Ponzi scheme. (*DeLoach v. Diamond Ventures, LLC*, Case No. 2009-CA-000548NC, Amend. Compl. at ¶ 48).

54.      In light of the foregoing, the investors themselves allege that Debtor engaged in a Ponzi scheme.

**D.      The CFTC Judgment Against the Debtor and Diamond Ventures**

55.      On September 2, 2009, the U.S. Commodity Futures Trading Commission (the "CFTC") filed a complaint against Beau Diamond and Diamond Ventures, LLC, in the United States District Court for the Middle District of Florida, Tampa Division, Case No. 8:09-CV-1811-17MAP (the "CFTC Action").

56.      In the CFTC Action, the CFTC alleged that the Debtor and Diamond Ventures engaged in acts and practices in violation of the Commodity Exchange Act.

57.      On April 16, 2010, the court in the CFTC Action entered an Order of Default Judgment for Permanent Injunction and Other Ancillary Relief Against Defendants Beau Diamond and Diamond Ventures, LLC (the "CFTC Default Judgment").

58.      In the CFTC Default Judgment, the court found that the Debtor and Diamond Ventures solicited $37 million from investors, purportedly to trade forex. (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 5 ¶ 10).

59.      The court further found that the Debtor and Diamond Ventures falsely represented

that Diamond Venture's forex trading generated monthly profits of up to 30%, that Diamond Ventures had a reserve account, and that investors were guaranteed monthly returns of between 2.75% and 5%. (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 6 ¶ 13).

60.    The CFTC Default Judgment further provided that contrary to their representations, the Debtor and Diamond Ventures only deposited a total of approximately $15.2 million in forex trading accounts. (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 7 ¶¶ 16-17).

61.    Of the money deposited in the forex trading accounts, approximately $1.9 million was withdrawn, and approximately $13.3 million was lost in forex trading from September 2006 to February 2009. (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 7 ¶ 17).

62.    The Debtor and Diamond Ventures engaged in no other investment activity to compensate for their trading losses. (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 7 ¶ 19).

63.    The CFTC Default Judgment further holds that from April 2006 to September 2009, the monthly returns paid to the Diamond Ventures customers "derived from the customers' original principal and/or money invested by subsequent customers in a manner akin to a Ponzi scheme." (*U.S. Commodity Futures Trading Commission v. Diamond*, Case No. 8:09-CV-1811-T-17MAP, Order of Default Judgment, p. 7 ¶ 19).

**E.    Various Indices of Fraud Placed Investors on Notice that the Debtor was Operating Diamond Ventures as a Ponzi Scheme**

64.    On April 18, 2006, the Debtor represented to investors by e-mail that he would offer

a 1% monthly referral fee for any person that investors referred to the club.

65.     As early as October 2006, investors experienced delay in being provided with account statements and responses to their e-mail inquiries.  Indeed, the Debtor and Diamond Ventures frequently failed to provide the investors with regular account balance statements, and frequently failed to respond to investors' questions regarding their account balances and investments.

66.     By January of 2007, some of the investors had actively begun to question whether the investment program was a Ponzi scheme due to the aggressive referral incentives.

67.     Through an e-mail correspondence on January 25, 2007, the Debtor announced to all investors that certain investors had become suspicious of the aggressive referral policy and apparent need to solicit new investors, and suggested that the investors believed the investment program to be a Ponzi scheme.  A copy of the January 25, 2007 e-mail correspondence is attached hereto as Exhibit "B".

68.     By the same e-mail dated January 25, 2007, the Debtor represented that referral incentives would not be offered, but that the minimum deposit would be increased to $50,000.00.  This increase in deposit amount should have put investors on notice that the program was dependent upon subsequent investments.

69.     The Debtor informed investors that the investors would be provided with Form 1099s reflecting their investment income, in order to report their income to the IRS.  However, in February of 2007, the Debtor advised investors that it was too late to send out Form 1099s for the previous year.  The Debtor also advised that Form 1099s were for the "benefit of the payor," were not needed by the parties receiving payment, and thus, Form 1099s would not be provided.

70.     Beginning in June 2007, the Debtor began notifying the investors that the returns

would be decreased and that those receiving 5% would be reduced to 4%.  Additionally, in July 2007, the Debtor also notified investors that Diamond Ventures was considering changing the return offered to new investors to 2%.  The decrease in return percentages should have put the investors on notice that the investment program was generating insufficient income to pay monthly returns.

71.    By e-mail correspondence dated July 11, 2007, the Debtor notified investors that he had been "unable to set aside enough company profits to let the internal capital build up because the overall average returns this year have so far been lower than last year's."  A copy of the July 11, 2007, e-mail correspondence is attached hereto as Exhibit "C".

72.    By the same e-mail correspondence, the Debtor further notified the investors that "[t]he profits left over after the funds dispersed to the reserve account this year have been very, very little."

73.    In the July 11, 2007 e-mail, the Debtor also informed investors that the rate of return paid to new investors would be decreased because the rate of return currently offered seemed less realistic to very wealthy people, and therefore a deterrent to new investors.

74.    In March 2008, the Debtor notified investors that funds on which the investors were taking monthly withdrawals would have a reduced return of 3.75%, and that any new funds deposited would earn only a 3% monthly return and only a 2.75% monthly return if the investor took monthly withdrawals.  According to the Debtor, this represented "an incentive to compound funds in the club."  Thus, investors were placed on notice that the Debtor had begun to discourage monthly withdrawals.

75.    Also, in March 2008, the Debtor resumed offering a 1% referral for commissions. In conjunction with declining return percentages, this should have put the investors on notice that

subsequent investments were necessary in order to sustain the monthly returns of prior investors. A copy of the Debtor's March 18, 2008 e-mail correspondence is attached hereto as Exhibit "D".

76.    On March 20, 2008, the Debtor again notified investors that certain investors were (again) expressing concerns about the changes occurring in the club, including declining returns, and that those same investors questioned whether the investments were producing income.  A copy of the March 20, 2008 e-mail correspondence is attached hereto as Exhibit "E".

77.    In the same March 20, 2008 e-mail, the Debtor represented that the "trading has been going quite well and a higher return had been achieved this past 8 months than ever before."  The patent conflict between the reduced monthly returns and the Debtor's statement that a higher return had been achieved than ever before, should have put investors on notice that the Debtor's representations with respect to the investments were false.

78.    On July 21, 2008, the Debtor began offering a 10% bonus to anyone depositing additional funds until he "hit the goal of additional funds needed."  A copy of the July 21, 2008 e-mail correspondence is attached hereto as Exhibit "F".

79.    In early December 2008, the Debtor reported to investors that their monthly return checks had been delayed because he had changed Diamond Ventures' banking institution from Bank of America to JP Morgan Chase.

80.    In late December 2008, the Debtor represented to investors that their monthly returns had not been received due to holiday mail delay.

81.    On January 9, 2009, the Debtor notified investors that he had lost the entirety of their investments through forex trading.

82.    As mentioned above, the Debtor's insolvency was obvious and indicated by the

declining rate of returns and increased efforts to solicit new investors, in order to pay the promised monthly returns to prior investors.

83.     In addition, from the inception of their operation, the Debtor and Diamond Ventures clearly possessed insufficient funds and assets to redeem all investments.

84.     While the Debtor did invest some portion of the funds in the forex trading market, the Debtor lost approximately $15.4 million in forex trading.  Thus, any monthly returns that were paid to investors as "profits" were funds obtained from existing customers' original principal and/or deposits by subsequent investors, and not funds gained through trading.

85.     During the operation of Diamond Ventures, many investors requested and received distributions from their accounts.  Certain investors also redeemed or closed their accounts, or removed portions of them.

86.     Some investors have freely admitted that they should have been on notice that the investment program was a fraudulent scheme.

87.     Craig Siegel, a chiropractor and investor in the club, has been quoted as saying "Greed created this . . . [p]eople wanted those 50 percent-a-year returns and looked at this through rose-colored glasses."

88.     At least one investor, Sal Boccio, has admitted that the investment program sounded "too good to be true" even prior to his initial deposit.

89.     Likewise, several of the Debtor's e-mail correspondence to investors acknowledged that returns for new investors would be decreased in order to make the guaranteed returns more "realistic" to prospective investors.

90.     The majority of the investors that participated in the investment program were

-14-

wealthy, sophisticated investors with knowledge of the market and the operation of investments, and with extensive experience in investment activities.

91.     Specifically, Kellum was a wealthy, sophisticated investor with knowledge of the investment market.

92.     Because Kellum was a sophisticated investor, he knew or should have known that forex trading was a high-risk investment that cannot rationally be guaranteed.

93.     Because Kellum was a sophisticated investor, he knew or should have known that the Debtor and Diamond Ventures could not guarantee the promised monthly returns unless the monthly returns were funded through subsequent investments.

94.      Because Kellum was a sophisticated investor, he knew or should have known that such an aggressive program of solicitation of new investors, coupled with commissions paid for referrals, was indicative of a Ponzi scheme whereby subsequent investments were required to fund monthly returns on prior investments.

95.     Based upon all the foregoing allegations, Kellum was on notice of the existing indicia of a fraudulent Ponzi scheme, but failed to make sufficient inquiry.

**F.     Despite Being on Notice that Diamond Ventures was being Operated as a Ponzi scheme, the Defendant Failed to make Diligent Inquiries into the nature of Diamond Ventures**

96.     The above described facts were sufficient indicia of fraud to place Kellum on inquiry notice and give rise to a duty for Kellum to make diligent inquiry into the nature of the Debtor's business operations.

97.     Despite the presence of indicia of fraud, Kellum failed or refused to make any inquiry.

98.     Kellum received fictitious profits, repayment of principal and/or monies from subsequent investors after being placed on inquiry notice by the indicia of fraud and without making any reasonable inquiry.

## COUNT I
### ACTUAL FRAUD – AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT UNDER 11 U.S.C. §§ 548(a)(1)(A) AND 550

99.     The Trustee repeats and realleges paragraphs 1 through 98 as if more fully set forth herein.

100.    This is an action against Daniel Kellum to recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550.

101.    The records of Diamond Ventures reflect that the Defendant, Kellum, transferred approximately $380,000.00 to the Debtor through Diamond Ventures which funds were part of the funds solicited by the Debtor in connection with his Ponzi Scheme.

102.    Within two years prior to the Petition Date, the Debtor through Diamond Ventures made the following transfers of funds belonging to the Debtor, from Bank of America account no. ending in 7477, to or for the benefit of Kellum (the "**Two Year Transfers**"):

| Date | Amount |
|------|--------|
| 4/2/07 | $12,000.00 |
| 5/2/07 | $12,000.00 |
| 6/5/07 | $12,864.51 |
| 7/3/07 | $14,400.00 |
| 8/2/07 | $14,400.00 |
| 9/4/07 | $14,400.00 |
| 10/1/07 | $14,400.00 |

| | |
|---|---|
| 11/1/07 | $14,400.00 |
| 12/1/07 | $14,400.00 |
| 1/1/08 | $14,400.00 |
| 2/1/08 | $14,400.00 |
| 3/1/08 | $14,400.00 |
| 4/1/08 | $14,400.00 |
| 5/15/08 | $13,500.00 |
| 6/9/08 | $13,500.00 |
| 7/1/08 | $13,500.00 |
| 8/1/08 | $13,500.00 |
| 9/1/08 | $13,500.00 |
| 10/8/08 | $13,400.00 |
| 11/10/08 | $13,500.00 |

103.    The Two Year Transfers were made as part of and in furtherance of the Debtor's operation of the Ponzi Scheme.

104.    The Debtor made the Two Year Transfers with actual intent to hinder, delay and defraud his creditors.

105.    The Two Year Transfers, from the Bank of America account maintained by the Debtor and Diamond Ventures, constituted transfers of an interest of the Debtor in property.

WHEREFORE, the Trustee demands final judgment in its favor and against the Defendant, Daniel Kellum:  (1) determining that the Two Year Transfers are fraudulent and avoidable pursuant to 11 U.S.C. § 548(a)(1)(A), and avoiding the Two Year Transfers; (2) entering final judgment in favor of the Trustee and against Kellum for the amount of the Two Year Transfers pursuant to 11 U.S.C. § 550, plus costs, pre-judgment interest, and post-judgment interest; and (3) disallowing any claim that Kellum may have against the Debtor, including without limitation, pursuant to 11 U.S.C. § 502(d); and, for such other relief as the Court deems just and proper.

**COUNT II**
**ACTUAL FRAUD – AVOIDANCE AND RECOVERY OF**
**FRAUDULENT TRANSFERS RECEIVED BY DEFENDANT**
**UNDER 11 U.S.C. §§ 544(b)(1)(A) AND 550**
**AND FLA. STAT. §§ 726.105(1)(a) AND 726.108**

106.    The Trustee repeats and realleges paragraphs 1 through 98 as if more fully set forth herein.

107.    This is an action against Daniel Kellum to recover fraudulent transfers pursuant to 11 U.S.C. §§ 544(b)(1)(A) and 550 and FUFTA.

108.    Pursuant to 11 U.S.C. §544(b), the Trustee may avoid any transfer of an interest of the Debtor in property that is voidable under applicable state law by a creditor holding an unsecured claim.

109.    The records of Diamond Ventures reflect that the Defendant, Maziekja, transferred approximately $380,000.00 to the Debtor through Diamond Ventures which funds were part of the funds solicited by the Debtor in connection with his Ponzi Scheme.

110.    Within four years prior to the Petition Date, the Debtor through Diamond Ventures made the following transfers of funds belonging to the Debtor, from Bank of America account ending in no. 7477, to or for the benefit of Kellum (the "**Four Year Transfers**"):

| Date | Amount |
|------|--------|
| 2/5/07 | $1,935.48 |
| 3/7/07 | $12,000.00 |
| 4/2/07 | $12,000.00 |
| 5/2/07 | $12,000.00 |
| 6/5/07 | $12,864.51 |
| 7/3/07 | $14,400.00 |
| 8/2/07 | $14,400.00 |

-18-

| | |
|---|---|
| 9/4/07 | $14,400.00 |
| 10/1/07 | $14,400.00 |
| 11/1/07 | $14,400.00 |
| 12/1/07 | $14,400.00 |
| 1/1/08 | $14,400.00 |
| 2/1/08 | $14,400.00 |
| 3/1/08 | $14,400.00 |
| 4/1/08 | $14,400.00 |
| 5/15/08 | $13,500.00 |
| 6/9/08 | $13,500.00 |
| 7/1/08 | $13,500.00 |
| 8/1/08 | $13,500.00 |
| 9/1/08 | $13,500.00 |
| 10/8/08 | $13,400.00 |
| 11/10/08 | $13,500.00 |

111.    The Four Year Transfers were made as part of and in furtherance of the Debtor's operation of the Ponzi Scheme.

112.    The Debtor made the Four Year Transfers with actual intent to hinder, delay and defraud his creditors.

113.    The Four Year Transfers, from the Bank of America account maintained by the Debtor and Diamond Ventures, constituted a transfer of an interest of the Debtor in property.

114.    At the time the Transfers were made, there existed an unsecured creditor with an unsecured claim against the Debtor pursuant to Florida Statutes §726.102(4).

115.    There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. § 502, who would have standing to assert a claim for relief under FUFTA.

116.    Creditors have filed claims against the Debtor, whose claims arose before or after the

Four Year Transfers were made.

117.    The Four Year Transfers are avoidable, and should be avoided, pursuant to and under Fla. Stat. § 726.105(1)(a) and 726.108 and 11 U.S.C. § 544(b)(1).

118.    Pursuant to Section 550(a) of the Bankruptcy Code, the recovery of property for the benefit of the Debtor's bankruptcy estate is authorized to the extent that the Four Year Transfers are avoided under 11 U.S.C. § 544(b)(1) and FUFTA

WHEREFORE, the Trustee demands final judgment in its favor and against the Defendant, Daniel Kellum:  (1) determining that the Four Year Transfers are fraudulent and avoidable  pursuant to 11 U.S.C. §§ 544(b) and 550 and FUFTA, and avoiding the Four Year Transfers; (2) entering final judgment in favor of the Trustee and against Kellum for the amount of the Four Year Transfers pursuant to 11 U.S.C. § 550, plus costs, pre-judgment interest, and post-judgment interest; and (3) disallowing any claim that Kellum may have against the Debtor, including without limitation, pursuant to 11 U.S.C. § 502(d); and, for such other relief as the Court deems just and proper.

## COUNT III
## EQUITABLE LIEN

119.    The Trustee repeats and realleges paragraphs 1 through 98 as if more fully set forth herein.

120.    This is an adversary proceeding to impose an equitable lien against the funds transferred by the Debtor to Daniel Kellum.

121.    Through his operation of Diamond Ventures, LLC as a fraudulent Ponzi scheme, the Debtor made certain Transfers to certain investors, including Transfers to Kellum, which represented fictitious profits, existing customers' original principal and/or money invested by subsequent customers.

122.   The Debtor and/or Diamond Ventures made transfers to Kellum as follows:

| Date | Amount |
|------|--------|
| 2/5/07 | $1,935.48 |
| 3/7/07 | $12,000.00 |
| 4/2/07 | $12,000.00 |
| 5/2/07 | $12,000.00 |
| 6/5/07 | $12,864.51 |
| 7/3/07 | $14,400.00 |
| 8/2/07 | $14,400.00 |
| 9/4/07 | $14,400.00 |
| 10/1/07 | $14,400.00 |
| 11/1/07 | $14,400.00 |
| 12/1/07 | $14,400.00 |
| 1/1/08 | $14,400.00 |
| 2/1/08 | $14,400.00 |
| 3/1/08 | $14,400.00 |
| 4/1/08 | $14,400.00 |
| 5/15/08 | $13,500.00 |
| 6/9/08 | $13,500.00 |
| 7/1/08 | $13,500.00 |
| 8/1/08 | $13,500.00 |
| 9/1/08 | $13,500.00 |
| 10/8/08 | $13,400.00 |
| 11/10/08 | $13,500.00 |

123.   The Debtor made the Transfers with actual intent to hinder, delay and defraud its creditors.

124.   Thus, the Transfers made to Kellum were obtained by fraud.

125.    There is a limited fund from which to satisfy all of the Debtor's obligations to investors and creditors.

126.    Some investors received fictitious profits, existing customers' original principal and/or money invested by subsequent customers from the Debtor and Diamond Ventures, LLC, while other investors received nothing at all.

127.    It is fair and equitable that an equitable lien be imposed on the fictitious profits, existing customers' original principal and/or money invested by subsequent customers, and equally distributed among all investors.

128.    Kellum is in possession of traceable funds transferred by the Debtor or Diamond Ventures, LLC which represent payment of fictitious profits, existing customers' original principal and/or money invested by subsequent customers.

129.    Kellum was unjustly enriched by the Transfers.

130.    Based upon the allegations set forth herein, equity requires the imposition of an equitable lien in favor of the Trustee for the benefit of the bankruptcy estate of the Debtor, as against all funds or other things of value that constituted the Transfer, or the proceeds or products of the Transfers.

WHEREFORE, the Trustee demands that this Court impose an equitable lien against the funds constituting the Transfers in the possession of Kellum, and all products and proceeds thereof, and for any other relief to which the Trustee may be entitled.

## COUNT IV
## CONSTRUCTIVE TRUST

131.    The Trustee repeats and realleges paragraphs 1 through 98 as if more fully set forth herein.

132.    This is an adversary proceeding to impose a constructive trust against the funds transferred by the Debtor to Daniel Kellum.

133.    Through his operation of Diamond Ventures, LLC as a fraudulent Ponzi scheme, the Debtor made certain Transfers to certain investors, including Transfers to Kellum, which represented fictitious profits, existing customers' original principal and/or money invested by subsequent customers.

134.    The Debtor and/or Diamond Ventures made transfers to Kellum as follows:

| Date | Amount |
| --- | --- |
| 2/5/07 | $1,935.48 |
| 3/7/07 | $12,000.00 |
| 4/2/07 | $12,000.00 |
| 5/2/07 | $12,000.00 |
| 6/5/07 | $12,864.51 |
| 7/3/07 | $14,400.00 |
| 8/2/07 | $14,400.00 |
| 9/4/07 | $14,400.00 |
| 10/1/07 | $14,400.00 |
| 11/1/07 | $14,400.00 |
| 12/1/07 | $14,400.00 |
| 1/1/08 | $14,400.00 |
| 2/1/08 | $14,400.00 |
| 3/1/08 | $14,400.00 |
| 4/1/08 | $14,400.00 |
| 5/15/08 | $13,500.00 |
| 6/9/08 | $13,500.00 |
| 7/1/08 | $13,500.00 |
| 8/1/08 | $13,500.00 |

| | |
|---|---|
| 9/1/08 | $13,500.00 |
| 10/8/08 | $13,400.00 |
| 11/10/08 | $13,500.00 |

135.    The Debtor made the Transfers with actual intent to hinder, delay and defraud his creditors.

136.    Thus, the Transfers made to Kellum were obtained by fraud.

137.    Based upon all the foregoing allegations, Kellum was on notice of the existing indicia of a fraudulent Ponzi scheme, but failed to make sufficient inquiry.

138.    Some investors received fictitious profits, existing customers' original principal and/or money invested by subsequent customers from the Debtor and Diamond Ventures, LLC, while other investors received nothing at all.

139.    It is fair and equitable that a constructive trust be imposed on the fictitious profits, existing customers' original principal and/or money invested by subsequent customers, and equally distributed among all investors.

140.    Kellum is in possession of traceable funds transferred by the Debtor or Diamond Ventures, LLC which represent payment of fictitious profits, existing customers' original principal and/or money invested by subsequent customers.

141.    Kellum was unjustly enriched by the Transfers.

142.    Based upon the allegations set forth herein, equity requires the imposition of a constructive trust in favor of the Trustee for the benefit of the bankruptcy estate of the Debtor, as against all funds or other things of value that constituted the Transfer, or the proceeds or products of the Transfers.

WHEREFORE, the Trustee demands that this Court impose a constructive trust against the

funds constituting the Transfers in the possession of Daniel Kellum, and all products and proceeds thereof, and for any other relief to which the Trustee may be entitled.

**COUNT V**
**UNJUST ENRICHMENT**

143.    The Trustee repeats and realleges paragraphs 1 through 98 as if more fully set forth herein.

144.    This is an action against Daniel Kellum for unjust enrichment.

145.    The Debtor and/or Diamond Ventures made transfers to Kellum as follows:

| Date | Amount |
|------|--------|
| 2/5/07 | $1,935.48 |
| 3/7/07 | $12,000.00 |
| 4/2/07 | $12,000.00 |
| 5/2/07 | $12,000.00 |
| 6/5/07 | $12,864.51 |
| 7/3/07 | $14,400.00 |
| 8/2/07 | $14,400.00 |
| 9/4/07 | $14,400.00 |
| 10/1/07 | $14,400.00 |
| 11/1/07 | $14,400.00 |
| 12/1/07 | $14,400.00 |
| 1/1/08 | $14,400.00 |
| 2/1/08 | $14,400.00 |
| 3/1/08 | $14,400.00 |
| 4/1/08 | $14,400.00 |
| 5/15/08 | $13,500.00 |
| 6/9/08 | $13,500.00 |
| 7/1/08 | $13,500.00 |
| 8/1/08 | $13,500.00 |

| 9/1/08 | $13,500.00 |
| 10/8/08 | $13,400.00 |
| 11/10/08 | $13,500.00 |

146.    The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

147.    The Debtor conferred a benefit upon Kellum by making the Transfers.

148.    The Transfers were made by the Debtor with actual intent to defraud creditors of the Debtor and Diamond Ventures.

149.    Because Kellum failed to provide the Debtor with reasonably equivalent value for the Transfers, Kellum has been unjustly enriched by the Transfers.

150.    Under the circumstances, it would be inequitable for Kellum to retain the benefit conferred by the Debtor and/or Diamond Ventures without providing reasonably equivalent value.

WHEREFORE, the Trustee demands a judgment for damages against Daniel Kellum for the value of said Transfers, plus costs and pre-judgment interest, and any other relief to which the Trustee may be entitled.

Dated: June 3, 2010.                    **FORIZS & DOGALI, P.A.**

/s/ Rachel S. Green
Robert Wahl, Esq.
Florida Bar No.: 0379050
rwahl@forizs-dogali.com
Joel J. Ewusiak, Esq.
Florida Bar No.:  0509361
jewusiak@forizs-dogali.com
Rachel S. Green, Esq.
Florida Bar No.: 016048
rgreen@forizs-dogali.com
4301 Anchor Plaza Parkway, Suite 300
Tampa, Florida 33634
Phone: (813) 289-0700; Fax:  (813) 289-9435
*Attorneys for Plaintiff Shari Streit Jansen, Chapter 7 Trustee*

-26-